UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CLINTON STRANGE, | : : : | Civil Action No. 18-4032 |
| Plaintiff, | : : | Hon. Nitza I. Quiñones Alejandro |
| v. | : : | |
| COMCAST CORPORATION d/b/a XFINITY, | : : : | |
| Defendant. | : : | |

**MEMORANDUM OF LAW IN SUPPORT OF COMCAST CORPORATION'S REPLY IN SUPPORT OF MOTION TO COMPEL ARBITRATION AND STAY LITIGATION**

**AKIN GUMP STRAUSS HAUER & FELD LLP**

Michael W. McTigue Jr.
Meredith C. Slawe
Two Commerce Square
2001 Market Street, Suite 4100
Philadelphia, PA 19103
Telephone:   (215) 965-1200
Facsimile:   (215) 965-1210
Email: mmctigue@akingump.com
mslawe@akingump.com

*Attorneys for Comcast Corporation d/b/a Xfinity*

I.   **INTRODUCTION**

In its Memorandum in Support of its Motion to Compel Individual Arbitration and Stay Litigation (Dkt. No. 7-1) ("Motion"), Comcast Corporation ("Comcast")[1] established that Plaintiff Clinton Strange ("Plaintiff") twice received the Agreement for Residential Services ("Subscriber Agreement"), including its clearly marked arbitration agreement. Comcast also established that Plaintiff accepted the agreement by his continued use of Comcast's service. Finally, Comcast established that Plaintiff's claims are within the scope of the parties' arbitration agreement.

Plaintiff tries to avoid his agreement to arbitrate his dispute with Comcast by arguing (1) despite his continued use of Comcast's service, he does not recall receiving or signing the Subscriber Agreement; (2) his dispute does not fall within the broad scope of the arbitration provision contained within the agreement; and (3) the Subscriber Agreement is an unenforceable adhesion contract. *See generally* Plaintiff's Response and Memorandum in Opposition to Comcast's Motion to Compel Arbitration (Dkt. No. 8) ("Opp'n"). These arguments fail.

*First*, Plaintiff has offered no competent admissible evidence in response to Comcast's evidence that he received the Subscriber Agreements. Under the express terms of the Subscriber Agreement, Plaintiff's continued use of Comcast's service constituted acceptance. Plaintiff's (unsubstantiated) claims that he cannot recall receiving the Subscriber Agreement do not create an issue of material fact on contract formation.

*Second*, Plaintiff's Telephone Consumer Protection Act, 47 U.S.C. § 227 *et seq.* ("TCPA") and the Sherman Anti-Trust Act, 15 U.S.C. §§ 1, 2 ("Sherman Act") claims both fall squarely

---

[1]   Comcast Corporation's Motion is subject to and without waiver of its arguments that Plaintiff has erroneously named Comcast Corporation, instead of Comcast Cable Communications, LLC, as a defendant in this action. Comcast Corporation is a holding company, not an operating company and is therefore not involved in the day-to-day management of its operating subsidiaries, including Comcast Cable Communications, LLC.

...

within the scope of the arbitration agreement.

*Finally*, as courts across the country have repeatedly held, the arbitration agreement, which includes an opt-out provision, is not unconscionable as a matter of law.

## II. ARGUMENT

### A. A Valid Arbitration Agreement Exists Between the Parties.

Plaintiff admits that he is a current Comcast subscriber who has used Comcast's service at his residence since July 2016. *See* Opp'n at 3 ("Plaintiff is a current subscriber to Defendant Comcast's Internet-only Plan and may have subscribed to the service on or about July 2016."); *see also id.* at 4 ("On or about July 2016 the Plaintiff did in fact open a Comcast Internet-Only account at his residence in Greenwood, LA"). Comcast has demonstrated through competent admissible evidence that Plaintiff received the Subscriber Agreement twice and continued to use Comcast's service following receipt. *See* Declaration of N. Patel ISO Motion ¶¶ 5–8, Dkt. No. 7-2 ("Patel Decl."). Furthermore, Plaintiff does not dispute that he had the opportunity, but elected not to opt out of the arbitration agreement. *Compare* Opp'n, *with* Patel Decl. ¶¶ 10–12.

#### 1. Plaintiff Accepted the Agreements by Continuing to Use Comcast's Service.

Plaintiff offers no affidavit or other admissible evidence[2] showing that he did not *receive* the Subscriber Agreements. Instead, Plaintiff merely claims in his opposition that he does not "*recall*" receiving (or signing) them. *See* Opp'n at 4. This is perhaps unsurprising given Comcast's uncontroverted business record establishes that Plaintiff *twice* received the Subscriber Agreement. *See* Patel Decl. ¶¶ 5–8.

---

[2] "When ruling on a motion to compel arbitration, the District Court uses a standard analogous to the summary judgment standard." *Schwartz v. Comcast Corp.*, 256 F. App'x 515, 518 (3d Cir. 2007).

Moreover, the Subscriber Agreement clearly provides that use of Comcast's service constitutes acceptance. On the first page of the 2016 Subscriber Agreement, it states, "**You will have accepted this Agreement and be bound by its terms if you use the Service(s) or otherwise indicate your affirmative acceptance of such terms.**" Patel Decl., Ex. 1 § 1 (emphasis in original). The 2017 Subscriber Agreement, again on the first page, states, "**If you use or otherwise indicate your acceptance of the Service(s), you have accepted this Agreement and agree to be bound by its terms.**" Patel Decl., Ex. 2 § 1 (emphasis in original). Plaintiff does not dispute that he has used Comcast's service since the initiation of his account in July 2016. *See* Opp'n at 3. Plaintiff merely argues that, "[c]ontinued use of a serve [*sic*] after being mailed an agreement, also may be insufficient proof to compel arbitration." Opp'n at 7. Plaintiff cites *Knutson v. Sirius XM Radio Inc.*, 771 F.3d 559 (9th Cir. 2014) in support of this proposition, but his reliance on that case is misplaced for at least two reasons.

*First*, *Knutson* involved claims arising out of California law, which does not apply. Here, the relevant state law is that of Louisiana, where Plaintiff receives services, and the substantive provisions of the FAA. *See, e.g.*, *Schwartz*, 256 F. App'x at 518 (explaining that the law of the state where plaintiff received services applies to resolve disputes concerning the existence of a valid agreement to arbitrate); *see also id.* ("The District Court correctly determined that the arbitration agreement at issue in this case is governed by the FAA.").

"Under Louisiana law, evidence indicating that an item has been properly mailed creates a presumption that the addressee received the item." *Truitt v. DirecTV, Inc.*, No. 08-3782, 2008 WL 5054570, at *3 (E.D. La. Nov. 21, 2008) (internal citation omitted). In *Truitt*, defendant cable company provided plaintiff satellite television services. *Id.* Pursuant to the provision of such services, the defendant sent plaintiff monthly bills, some of which contained copies of the service

agreement, which included a binding arbitration agreement. *See id.* The plaintiff in *Truitt*, like Plaintiff Strange here, "denie[d] that he received a copy of the Customer Agreement . . . ." *Id.* The court held that "**[s]uch denials by Truitt do not overcome the presumption that he received copies of the Customer Agreement**." *Id.* (emphasis added); *see also id.* ("Since [Plaintiff] continued to receive DirecTV services and did not cancel until on or about December 2006, the Court finds that Truitt had already consented to the Customer Agreement (including its arbitration provisions) by silence or inaction. . . . Therefore Truitt is bound to the Customer Agreement with DirecTV."). The same result follows here.[3]

*Second*, *Knutson's* facts are readily distinguishable. The plaintiff purchased a vehicle from Toyota that came with a 90-day trial subscription to Sirius XM satellite radio, and subsequently received a "Welcome Kit" from Sirius XM that contained an arbitration agreement. 771 F.3d at 562. Because the plaintiff had entered into a contract with Toyota—and not Sirius XM—the court held that "[a] reasonable person in Knutson's position could not be expected to understand that purchasing a vehicle from Toyota would simultaneously bind him or her to any contract with Sirius XM. *Id.* at 566. Indeed, the court distinguished *Knutson* from two other cases where, as here, the consumer received services **directly** from the party seeking to compel arbitration. *See id* at 567 (citing *Bischoff v. DirecTV, Inc.*, 180 F. Supp. 2d 1097 (C.D. Cal. 2002); *Lozano v. AT&T Wireless*, 216 F. Supp. 2d 1071 (C.D. Cal. 2002)). As explained by *Knutson*:

---

[3]   Plaintiff also claims that he does not recall anyone reading the Subscriber Agreement to him. *See* Opp'n at 4. While Plaintiff does not even articulate that this is required under state or federal law, courts have rejected such claims out of hand. *See, e.g.*, *O'Quinn v. Comcast Corp.*, No. 10 C 2491, 2010 WL 4932665, at *4 (N.D. Ill. Nov. 29, 2010) ("Comcast is not required to have read the arbitration provision aloud to O'Quinn in order for him to be bound by it.").

> *Bischoff* and *Lozano* turn on crucial facts not present here. In *Bischoff*, unlike with Knutson, the customer specifically elected to receive the service *directly* from the service provider . . . .
>
> Likewise in *Lozano*, the customer signed a contract for service from the service provider, AT&T, and a Welcome Guide was provided in the box with the newly purchased phone.
>
> Here, by contrast, there is no evidence that Knutson purchased anything from Sirius XM, or ever knew that he was entering into a contractual relationship with the satellite radio service provider. Unlike in *Bischoff*, there was no initial transaction between Knutson and the service provider, Sirius XM. There was only a transaction between Knutson and Toyota. . . .

*Knutson*, 771 F.3d at 567–68 (internal citations omitted) (emphasis in *Knutson*). *Knutson* does not hold, much less support Plaintiff's argument that arbitration agreements in a "Welcome Kit" are inherently unenforceable.[4]

### 2. As Plaintiff's Own Authority Makes Clear, His Signature is Not Required To Bind Him.

Plaintiff concedes that, even under Louisiana state law, "as to arbitration agreements, despite a statute requiring them to be in *writing,* Louisiana law does not require the agreements to be *signed* to be enforceable." Opp'n at 11 (citing *Hurley v. Fox*, 520 So. 2d 46 7, 469 (La. Ct. App. 4 Cir. 1988) (emphasis in Opp'n)); *see also Alford v. Johnson Rice & Co.*, 99-3119, p. 5 (La. App. 4 Cir. 11/15/00), 773 So. 2d 255, 258 (explaining that the FAA applies to contracts involving commerce and "[i]n addition, written agreements to arbitrate do not have to be signed."); *see also* Motion at 6 n.15; *accord* Opp'n at 7 ("Under the [FAA], the contract containing the arbitration

---

[4]   Nor do Plaintiff's other cases alter the analysis or the conclusion. *See* Opp'n at 7, n. 9 (citing *Campbell v. SI Wireless, LLC*, No. 16-1320, 2017 U.S. Dist. LEXIS 143122, at *7–9 (S.D. Ill. Sept. 5, 2017); *Shaffer v. HSBC Bank Nev.*, No. 12-0968, 2012 U.S. Dist. LEXIS 69818, at *10–13 (S.D.W. Va. May 18, 2012)). In *Campbell*, the court held that under Seventh Circuit precedent, a text message sent to plaintiff containing a link to updated terms of service on a webpage was insufficient notice of updated contract terms. In *Shaffer*, a case resolved under West Virginia law, there was no evidence that the plaintiff was provided the relevant arbitration agreement.

provision does not need to be signed, but it must be written (either in paper or electronic format).").[5]

**B.     Plaintiff's Claims Fall Squarely Within the Scope of the Arbitration Provision.**

Plaintiff's claims are plainly within the scope of the arbitration agreement, which requires individual arbitration of any "Dispute" related to his relationship with Comcast. Patel Decl., Ex. 2 § 13(b).[6]  It is unclear whether Plaintiff even challenges that his dispute falls within the arbitration provision.

Plaintiff alleges that Comcast sent him text messages without his consent. *See* Compl. ¶¶ 1–30; *id.* ¶ 11 & Exs. C–P. He alleges that these messages violated the TCPA. *Id.*; *see also id.* Counts I & II. Plaintiff also asserts claims under the Sherman Act for alleged "outages" he experienced to his Comcast service. *Id.* ¶¶ 36–96; *see also id.* Count III.

Accordingly, Plaintiff's claims necessarily constitute a "dispute involving [him] and [Comcast]" and are plainly "related to [Comcast]" or otherwise related to the "relationship" between Plaintiff and Comcast. Patel Decl., Ex. 2 § 13(a)–(b). Given the heavy presumption in favor of arbitrability, where "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or any allegation of waiver, delay, or a like defense to arbitrability," Plaintiff's claims must be arbitrated on an individual basis. *Chassen v. Fid. Nat'l Fin. Inc.*, 836 F.3d 291,

---

[5]     The Subscriber Agreements are plainly in writing. *See* Patel Decl., Exs. 1 and 2.

[6]     "Dispute" is broadly defined as, among other things, "any claim or controversy related to us or our relationship, including but not limited to any and all: (1) claims for relief and theories of liability, whether based in contract, tort, fraud, negligence, statute, regulation, ordinance, or otherwise; (2) claims that arose before this or any prior Agreement; . . . and (4) claims that are the subject of purported class action litigation." Patel Decl., Ex. 2 § 13(b); *see also id.* ("This arbitration Provision shall be broadly defined.").

295 (3d Cir. 2016) (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24–25 (1983)).

C. **The Arbitration Agreement is Not an Unenforceable Adhesion Contract.**

The Louisiana Supreme Court has held that, in "addressing the determination of the enforceability of arbitration agreements under a contract of adhesion analysis . . . ***a presumption*** of arbitrability does exist." *Aguillard*, 908 So. 2d at 24 (emphasis added). "Accordingly, even when the scope of an arbitration clause is fairly debatable or reasonably in doubt, the court should decide the question of construction in favor of arbitration." *Id.* at 25; *see also id.* ("***Therefore, even if some legitimate doubt could be hypothesized, this Court, in conjunction with the Supreme Court, requires resolution of the doubt in favor of arbitration***." (emphasis added). Plaintiff does not overcome this presumption.

*Truitt* is again instructive. There, like here, "[plaintiff] had sufficient opportunity to refuse service and thereby also reject the terms of the contract." *Id.* "The first [page] of the [Subscriber] Agreement alerts the potential customer in capitalized letters that continuing to receive [Comcast]'s service means that the customer accepts the terms and conditions of the [Subscriber] Agreement, including the provisions relating to arbitration." *Id.* Also like here, there was nothing "'uneven' about the rights as created in the arbitration provision or any indication that would make the arbitration provision substantively unconscionable." *Id.* The arbitration provision contains several features that make it inexpensive and convenient for subscribers, including (1) providing access to a convenient forum;[7] (2) permitting subscribers sue in small claims court;[8] (3) requiring

---

[7]   *See* Patel Decl., Ex. 2 § 13(g).
[8]   *See id.*, Ex. 2 § 13(f).

Comcast to pay for arbitral fees and costs in circumstances involving claims for less than $75,000;[9] and (4) permitting an award of attorneys' fees under certain circumstances, including to the extent justified by the law under which the subscriber seeks relief.[10]

Notably, Plaintiff has not cited a single case in which Comcast's consumer-friendly arbitration agreement was found unconscionable. Rather, Plaintiff claims that the broad scope of the provision somehow forecloses its enforcement. *See* Opp'n at 6 ("An extremely broad arbitration agreement may raise enforceability concerns with respect to unconscionability." (internal footnote omitted)). Such a generic and unremarkable claim is insufficient to satisfy Plaintiff's burden of overcoming the broad presumption favoring arbitration. In addition, no such claim can properly be attributed to the arbitration provision at issue here, which is appropriately narrow in scope, and which expressly excludes multiple disputes from its reach. *See* Patel Decl., Ex. 2 § 13(c).

Regardless, Plaintiff had a choice. Comcast provided Plaintiff with the opportunity to opt out of arbitration within thirty (30) days "of the date that [Plaintiff] first receive[d] this Agreement" without having any adverse effect on his services or relationship with Comcast. Patel Decl. ¶ 10, Ex. 1 § 13(c). Courts routinely find that such opt-out rights "weigh[] heavily against a finding of procedural unconscionability." *O'Quinn*, 2010 WL 4932665, at *5; *see also Trout v. Comcast Cable Commc'ns, LLC*, No. 17-1912, 2018 WL 4638705, at *5 (N.D. Cal. Mar. 15, 2018) ("Although Trout insists this was a contract of adhesion, the opt-out opportunity means it was not."). **Plaintiff does not dispute that he did not opt out of arbitration**. *See generally* Opp'n; *see also* Patel Decl. ¶¶ 11–12.

---

[9]   *See id.*, Ex. 2 § 13(i).

[10]   *See id.*

### III.     CONCLUSION

For these reasons and the reasons set forth in Comcast's Motion, Comcast respectfully requests that the Court compel Plaintiff to comply with the written arbitration agreement and stay this action in its entirety during the pendency of any resulting individual arbitration proceeding.

Date: November 7, 2018

Respectfully submitted,

*/s/* Michael W. McTigue Jr.
**AKIN GUMP STRAUSS HAUER & FELD LLP**
Michael W. McTigue Jr.
Meredith C. Slawe
Two Commerce Square
2001 Market Street, Suite 4100
Philadelphia, PA 19103
Telephone:     (215) 965-1200
Facsimile:     (215) 965-1210
Email: mmctigue@akingump.com
            mslawe@akingump.com

*Attorneys for Comcast Corporation d/b/a Xfinity*